## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES MINERAL PRODUCTS COMPANY, d/b/a ISOLATEK INTERNATIONAL,<br><br>    Plaintiff,<br><br>vs.<br><br>WESTCHESTER FIRE INSURANCE COMPANY and ACE WESTCHESTER SPECIALTY GROUP,<br><br>    Defendants. | Civil Action No.:  11-CV-05280<br><br>Honorable William J. Martini, U.S.D.J.<br><br><br>DOCUMENT FILED ELECTRONICALLY |

---

## REPLY BRIEF IN FURTHER SUPPORT OF PLAINTIFF'S APPLICATION FOR AN ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION

---

McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ  07102-4056
(973) 622-4444
Attorneys for Plaintiff

Of Counsel
    Lisa S. Bonsall
    Steven H. Weisman
On the Brief
    Craig W. Davis
    Lauren E. Ciancia

MEI 12431197v.1

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................... 1

I.   USM Is Entitled To Injunctive Relief Requiring Westchester To
     Fund The Full Amount Of A Bond ...................................................... 1

     A.   Absent Injunctive Relief, USM Will Suffer Irreparable
          Harm Because It Cannot Fund An Appeal Bond ....................... 2

     B.   Absent Injunctive Relief, USM Will Suffer Immediate
          Harm ....................................................................................... 5

     C.   Westchester Will Not Be Harmed If It Is Required to
          Fund a Bond Pending USM's Appeal of Tran ........................... 6

     D.   USM Is Likely to Prevail on the Merits of Its Bad Faith
          Claim ....................................................................................... 8

          1.   The Record Confirms Westchester Breached Its Covenant of
               Good Faith and Fair Dealing ............................................... 8

          2.   Whether or Not Punitive Damages Are Insured Under the
               Policy Has No Bearing on USM's Likelihood of Success on
               the Merits .......................................................................... 11

     E.   The Public Interest Favors This Injunctive Relief ................... 11

          1.   *Rova Farms'* Public Policy Concerns Support USM's
               Request .............................................................................. 11

          2.   *Courvoisier's* Public Policy Concerns Support USM's
               Request .............................................................................. 12

II.  Federal Rule 65(c)'s Bond Requirement Is Not Absolute ................. 14

III. The ADR Provision Does Not Expressly Bar This Action ................ 14

CONCLUSION ..................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aldasoro v. Kennerson,*
915 F. Supp. 188 (S.D. Cal. 1995) ...................................................................... 5

*In re Arthur Treacher's Franchisee Litigation,*
689 F.2d 1137 (3d Cir. 1982) .......................................................................... 7

*Athridge v. Rivas,*
236 F.R.D. 6 (D.D.C. 2006) ............................................................................ 7

*BP Chems. Ltd. v. Formosa Chem. Fibre Corp.,*
229 F.3d 254 (3d Cir. 2000) ............................................................................ 5

*Canterbury Career School, Inc. v. Riley,*
833 F. Supp. 1097 (D.N.J. 1993) ............................................................. 11, 14

*Courvoisier v. Harley Davidson of Trenton, Inc.,*
162 N.J. 153 (1999) ............................................................... 5, 6, 12, 13

*Elli v. Genmab,*
2006 U.S. Dist. LEXIS 74615 (D.N.J. Oct. 13, 2006) ...................................... 15

*Instant Air Freight Co. v. C.F. Air Freight, Inc.,*
882 F.2d 797 (3d Cir. 1989) ............................................................................ 2

*Meadows v Hudson County Bd. of Elections,*
2006 U.S. Dist. LEXIS 64050 (D.N.J. Aug. 24, 2006) ...................................... 15

*In Re Pet Food Prods. Liab. Litig.,*
629 F. 3d 333 (3d Cir. 2010) .......................................................................... 15

*PPG Indus., Inc. v. Transamerica Ins. Co.,*
20 Cal. 4th 310 (1999) .................................................................................. 11

*Pyramid Elec. Co. v. Staklinski,*
61 N.J. Super. 278 (App. Div. 1960), *cert. denied*, 33 N.J. 117 (1960) ............ 14

*Rova Farms Resort, Inc. v. Investors ins. Co.,*
65 N.J. 474 (1974) ....................................................... 5, 8, 9, 10, 11, 12, 13

*Saturn of Denville New Jersey, LP v. General Motors Corp.*,
    2009 U.S. Dist. LEXIS 45155 (D.N.J. May 29, 2009) ........................................2

*Sonotone Corp. v. Hayes*,
    4 N.J. Super. 326 (App. Div. 1949) ................................................. 15

*Tehan v. Disability Mgmt. Servs., Inc.*,
    111 F. Supp. 2d 542 (D.N.J. 2000) ....................................................2

*Temple University v. White*,
    941 F.2d 201 (3d Cir. 1991) .............................................................. 14

**STATUTES**

Federal Arbitration Act, Section 3 ......................................................... 15

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 65(c) ................................................. 14

New Jersey Court Rule 2:9-6 ............................................................... 12

ME1 12431197v.1

## PRELIMINARY STATEMENT

Westchester Fire Insurance Company's ("Westchester") refusal to engage in good faith settlement negotiations, and its refusal to authorize USM to conduct settlement negotiations, prevented USM from avoiding a catastrophic jury verdict in the Tran Action. USM seeks conditional injunctive relief, requiring Westchester to post a bond (or otherwise obtain a stay pending appeal), in order to maintain the status quo -- allow USM to remain solvent and conduct its business -- pending resolution of the parties' dispute. Without such relief, USM's business will be destroyed and, therefore, it will be irreparably harmed.

Unlike USM's risk absent relief, which is substantial and catastrophic, the risk to Westchester in granting relief is minimal because it retains all of its rights to litigate and recover damages. Requiring Westchester to provide a bond allows USM to prosecute its rights without a bankruptcy and without impairing Westchester's rights at all.

## ARGUMENT

## I.   USM Is Entitled To Injunctive Relief Requiring Westchester To Fund The Full Amount Of A Bond

The following factors govern a federal district court's decision whether to grant preliminary injunctive relief: (1) the movant's reasonable probability of success on the merits, (2) whether the movant will be irreparably harmed if relief is denied, (3) whether granting relief will result in even greater harm to the

nonmoving party, and (4) whether granting the relief is in the public interest.
*Tehan v. Disability Mgmt. Servs., Inc.*, 111 F. Supp. 2d 542, 550 n.10 (D.N.J.
2000). All of these factors favor granting USM injunctive relief. While the federal
standard for a preliminary injunction applies, New Jersey state law governs the
substantive analysis of factors going to injunctive relief. *See Instant Air Freight
Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799 (3d Cir. 1989).

### A.   Absent Injunctive Relief, USM Will Suffer Irreparable Harm Because It Cannot Fund An Appeal Bond

Westchester acknowledges that the destruction of a viable business
constitutes irreparable harm.[1] The consequences of a $4 million judgment that is
not stayed on a company with annual net income of 10% to 50% of that judgment
in any given year cannot be seriously disputed: once the Tran plaintiff executes on
the judgment, USM will be forced out of business or into bankruptcy. *See* Oct. 21,
2011 Supplemental Certification of Thomas A. Gallagher ("Supp. Cert.") ¶¶ 4, 9.

Westchester grossly misinterprets the indisputable financial facts submitted
by USM. Westchester refers to USM's balance sheet assets as support for its
conclusion that USM could somehow survive execution on a $4 million judgment,
completely ignoring that those assets are reduced by, and already secure repayment

---

[1]   *See Saturn of Denville New Jersey, LP v. General Motors Corp.*, 2009 U.S.
Dist. LEXIS 45155, at *20 (D.N.J. May 29, 2009) (requiring a company to post a
bond "tying up funds that could be used for other purposes and impede its efforts
to remain solvent" "raises issues of irreparable harm").

2

of $22,209,052 in liabilities. *See* Supp. Cert., ¶3. USM has less than $200,000 of cash at any given time (and an insignificant additional sum of liquid securities). Its remaining assets are neither available nor acceptable to the bonding companies as collateral for a supersedeas bond. *See* Aug. 23, 2011 Cert. of Thomas A. Gallagher ("Initial Cert.") ¶6, Exh. A; Supp Cert., ¶3 and Exh. 2 thereto.

Nor can those assets be liquidated to secure or bond the judgment.[2] USM is a manufacturing company, and needs all of its assets to operate. The vast majority of the assets are property and equipment ($12,595,718) used in the manufacturing process, and the raw materials and product inventory ($11,005,153) that USM sells. Supp. Cert., ¶4. If USM liquidated its plants, it would have no facilities from which to conduct its operations, no product to sell to customers, and therefore no business. These assets are simply not relevant to the bonding analysis – no one will accept such assets as collateral, and USM cannot sell them to obtain the cash because they are necessary for USM to stay alive and operate. *Id.*

Nor can USM borrow money from its line of credit to provide collateral, as Westchester seems to suggest. Such use of loan proceeds is flatly prohibited by the Loan Agreement. *Id.* at ¶3. Improper use of such monies is a default under the

---

[2]     Prepaid expenses and deferred income taxes have no value to anyone other than USM and then only if USM is operating. Goodwill, intangibles, and pledged security deposits are similarly unavailable. Accounts receivable, which the bonding companies would not accept, supply the cash flow to pay the revolving line of credit. *See* Supp. Cert., ¶ 5; Initial Cert., Exh. B.

loan agreement, which the lender would not allow (it would not fund the draw) in any event. *Id*. Indeed, USM's lender is closely monitoring USM to see what happens with the bonding issue because it knows that USM does not have the funds available to secure the bond. *Id*. at ¶6. Furthermore, execution activity would likewise be a default. *See id*. at ¶¶ 1, 7-8.

It is clear that USM cannot pay or bond a $4 million judgment because it does not have cash or assets available to do so. The immediate risk and likely irreparable harm is, therefore, the risk of execution and levy on USM's accounts. *See id*. at ¶¶ 3-4, 6-8. Execution on accounts would deprive USM of operating funds, trigger a default and acceleration of debt, and render the company unable to continue operations outside of bankruptcy. *Id*. Under such circumstances, USM would be forced to cease to operate or file for bankruptcy. *Id*.

Finally, Westchester's suggestion that USM has somehow "paid" the judgment because it accrued a charge on its books is wrong. Opp. Br. at 19. This charge was a book entry accrual to disclose and reflect for liability for accounting purposes; it does not indicate that USM has paid or can pay a $4 million judgment or post a $5 million bond. Supp. Cert. at ¶ 10. In fact, the charge put USM in a steep deficit position, and resulted in a stated net loss of $2,216,747 for fiscal 2011. *Id*. Without that charge, USM's financials would have reflected total net

4

income for the entire year of approximately $400,000, less than one-tenth of the liquid collateral required for a bond to stay execution pending appeal. *Id.*

Westchester cannot seriously dispute that USM is financially and contractually unable to bond a $4 million judgment, and that requiring it to do so would force USM out of business or into bankruptcy. This type of harm is irreparable, and cannot be cured later by any payment of money damages.[3] *See Courvoisier v. Harley Davidson of Trenton, Inc.*, 162 N.J. 153, 166 (1999) (recognizing that when an insured alleges its insurer's bad faith was the cause of an excessive judgment, it is "unrealistic" to expect that an insured under such circumstances could be made whole after a full-fledged *Rova Farms* hearing).

## B.    Absent Injunctive Relief, USM Will Suffer Immediate Harm

Westchester wrongly asserts that USM has failed to show "immediate" harm justifying preliminary relief. The Third Circuit has acknowledged that "imminence requires that the harm will occur before a trial on the merits can be had." *BP Chems. Ltd. v. Formosa Chem. Fibre Corp.*, 229 F.3d 254, 263 (3d Cir. 2000) (internal citations omitted). Thus, "imminence" or "immediacy" does not

---

[3]    Westchester wrongly argues that USM can pursue an appeal without posting a supersedeas bond if it successfully moves for a stay of execution pending appeal without a bond. Not only is the outcome of such an endeavor uncertain under applicable law, *see Aldasoro v. Kennerson*, 915 F. Supp. 188, 190 (S.D. Cal. 1995), but the timing is problematic. If the motion is not granted within ten days, execution proceedings are not stayed. It is for this reason that USM needs the conditional protection it seeks here.

implicate some definite span of time in which harm must occur, as Westchester
suggests. All that is required is that the harm will occur before trial on the merits
of the issue can be resolved. There can be no doubt that this standard is met here.
Even assuming Westchester's timeline of events, the judgment will be entered
within the next one or two months, and USM will be unable to bond it to stay
enforcement proceedings. There is realistically no chance that USM's bad faith
and contract claims against Westchester will be resolved within that time period.[4]

### C. Westchester Will Not Be Harmed If It Is Required to Fund a Bond Pending USM's Appeal of Tran

Westchester will suffer little to no harm in funding or posting an appeal
bond. As the New Jersey Supreme Court recognized in *Courvoisier*, 162 N.J. at
165-66, the conditional nature of the bond protects Westchester in the unlikely
event USM loses both its appeal of the Tran judgment and its claims against
Westchester. If that happens, Westchester retains all rights to dispute its obligation
to bond the judgment, and to seek recovery from USM.[5] This, moreover, is

---

[4]    Even if the Court were to determine that USM does not face imminent harm,
it should retain jurisdiction over, and/or stay, these proceedings pending the
outcome of post-trial motions in Tran, because the severe nature of the irreparable
harm USM will face if those motions are unsuccessful will require a swift
resolution of USM's need for injunctive relief, when USM faces imminent
execution of the full Tran judgment.

[5]    Contrary to Westchester's argument, USM does not seek "mandatory" relief
simply for payment of money damages. *See* Opp. Br. at 15-21. On the contrary,
USM seeks to enjoin Westchester to conditionally fund an appeal bond to preserve

MEI 12431197v.1

consistent with Westchester's good faith, fiduciary and other obligations to USM and provides USM with the protection it bargained for in buying the policy. *See, e.g.*, *Athridge v. Rivas*, 236 F.R.D. 6, 8 (D.D.C. 2006) (insurer's good faith duties include assisting in procuring supersedeas; insurer cannot simply abandon insured to execution of judgment without a chance to appeal).

The insurance policy's Allocation Provision, moreover, obligates Westchester to fund an appeal bond for the entire judgment. *See* Opp. Br. at 5. The provision states that, in the event of covered and uncovered Claims, allocation shall be made "between covered Loss (**except for Defense Costs**) and loss that is not covered...." The terms "Claim," "Loss" and "Defense Costs" are defined in the policy. *See* Davis Cert., Ex. A. The definition of Loss includes Defense Costs (which include appeal bond costs). *See id.* The allocation provision, therefore, provides that as between covered and uncovered Claims, no Defense Costs shall be allocated between Westchester and USM. Because appeal bond costs are Defense Costs (as defined by the policy), Westchester must pay one hundred percent of the

---

USM's business while it and USM seek to reduce or reverse the Tran judgment on appeal. The cases Westchester cites in this regard are distinguishable from this case and inapposite. *E.g.*, *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1146, 1148-49 (3d Cir. 1982) (reversing district court's award of past royalty payments when, among other things, plaintiff never claimed that the payment enjoined was necessary for its survival) and never requested such relief (and hence defendant had no opportunity to oppose it).

MEI 12431197v.1

costs to bond the entire judgment, even those purportedly associated with uncovered portions of the judgment.

Posting a bond for this judgment is precisely what is contemplated by an insurance policy and is the risk that an insurance company is in the business of assuming. Westchester is an insurance company with millions in assets. *See* Aug. 23, 2011 Cert. of Craig W. Davis ("Davis Cert."), ¶4, Exh. B. There can be no doubt that Westchester, which sold a $5 million insurance policy to USM, has sufficient assets to cover the judgment.

### D.   USM Is Likely to Prevail on the Merits of Its Bad Faith Claim

#### 1.   The Record Confirms Westchester Breached Its Covenant of Good Faith and Fair Dealing

Westchester correctly cites the standard for bad faith failure to settle under *Rova Farms*: an insurer's decision not to settle on behalf of its insured must be "thoroughly honest, intelligent and objective" and cannot rely exclusively on the view of the carrier or its attorney. *Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 N.J. 474, 489-90 (1974). "[A] good faith evaluation requires more," including "consideration of the anticipated range of a verdict," the strengths and weaknesses of the parties' respective cases, the history of similar cases in the same geographic area, and factors related to the progress of trial itself. *Id.* at 490.

Westchester concedes that it did not conduct the good faith evaluation required under *Rova Farms*. The October 12, 2011 Certification of Danielle

8

Batchelor ("Batchelor Cert."), Westchester's claims handler responsible for the

claim being litigated, confirms:

- Westchester improperly relied solely on its appointed defense counsel in evaluating settlement possibilities (*See* Batchelor Cert., *passim*);

- Westchester never analyzed (much less reviewed) the mock trial report (*see id.*);

- Westchester never assessed a potential range of verdict or considered a possible punitive damages award, notwithstanding the mock trial report (*see id.*); and

- Having failed to increase its litigation reserve (*see id.* ¶ 10; Opp. Br. at 8-9) notwithstanding the warnings in the mock trial report, which should have alerted a reasonable insurer to the likelihood of an adverse verdict, Westchester was completely unprepared to negotiate a settlement in the days leading up to trial once the Tran plaintiff reduced his demand below $1 million – the point at which Westchester and USM agreed to begin concerted settlement negotiations with Tran (*see* Batchelor Cert., *passim*).

Ms. Batchelor essentially admits that she did not review defense counsel's

daily trial reports ███████████████████████████████

████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████

████████████████████   Cert. of Lauren E. Ciancia ("Ciancia Cert."), Exh. A.

There is no better evidence of Westchester's lack of good faith than Ms.

Batchelor's statement that she had no notice that trial was not going well until Day

Three.

Remarkably, Westchester faults *USM* for not alerting Westchester to the urgent need to settle the Tran matter ahead of trial. *See* Batchelor Cert. ¶ 9. Apart from the obvious fact that trial was imminent, the urgency involved was clear from the fact that USM's director of legal services, Paulette Stropnicky, communicated with Ms. Batchelor *almost daily* from the day Plaintiff's lowered demand came in through the 5 days it took to get a response. *See* Aug. 23, 2011 Stropnicky Cert. ¶¶ 8-19. Indeed, Ms. Stropnicky was so frustrated that she even obtained the assistance of outside counsel because Westchester was dragging its feet and refusing to provide any settlement authority before trial. Stropnicky Cert., ¶ 16. It was only after counsel demanded a response that Westchester replied at all, and even then it took two more days.

Only after the third day of trial did Westchester provide $300,000 in settlement authority. Westchester's appointed defense counsel relayed this authorization on May 31, 2011 (Batchelor Cert. ¶ 14), ███████████████ ████████████████████████████████████████████ Ciancia Cert., Ex. A. As Westchester and its appointed defense counsel were aware, this offer was too little, too late, as was Westchester's later counteroffer of $750,000. By all accounts, Westchester unreasonably withheld settlement authority, was woefully unprepared to protect its insured against the verdict in Tran, and failed in every single aspect of its good faith duties under *Rova Farms*.

10

2. <u>Whether or Not Punitive Damages Are Insured Under the Policy
Has No Bearing on USM's Likelihood of Success on the Merits</u>

USM does not seek coverage for punitive damages; it seeks preliminary

protection pending adjudication of its claim to compensatory and consequential

damages flowing from Westchester's breach of its contractual and good faith

duties owed to USM. Because USM ultimately seeks consequential damages

flowing from Westchester's breach, Westchester concedes that *Rova Farms* is

directly on point. *See* Opp. Br. at 26 ("*Rova Farms* deals with standards of

imposing liability on an insurer for *consequential damages* …).[6]

**E.     The Public Interest Favors This Injunctive Relief**

Finally, in determining whether to grant or deny preliminary injunctive

relief, the courts consider whether the public interest will be served. *Canterbury

Career School, Inc. v. Riley*, 833 F. Supp. 1097, 1104 (D.N.J. 1993).

1. <u>*Rova Farms*' Public Policy Concerns Support USM's Request</u>

The public interest is best served by compelling Westchester to provide the

protection that USM bargained for and of which Westchester deprived USM by

preventing USM from settling the Tran Action. Insurers cannot demand and retain

---

[6]      Westchester concedes that (1) New Jersey substantive law applies (*see* Opp.
Br. at 26-27; and (2) **this is a contract action**. *See* Opp. Br. at 27. As such,
Westchester's reliance on California law (*PPG Industries, infra*) is misplaced.
USM is located in New Jersey and the policy was delivered to its insured in New
Jersey. Westchester conducted its claims handling for USM out of its office in
New Jersey. Moreover, ***PPG is based on tort law***, not contract law. *PPG Indus.,
Inc. v. Transamerica Ins. Co.*, 20 Cal. 4th 310, 315 (1999). There is no basis for
California law to apply and Westchester's reliance on California law is misplaced.

11

the unilateral right to settle, refuse to settle or even respond to settlement overtures, and then force the insured to suffer the consequences of the insurer's unilateral decisions. *Rova Farms*, 65 N.J. at 492-93. Westchester's policy prohibited USM from settling without Westchester's authority. Davis Cert., Ex. A (Optional Duty to Defend End., §X.C.) As a matter of public policy, Westchester cannot be permitted to refuse to settle and shift the risk of trial to its insured by forcing USM to deal with the consequences of its inaction. The overriding public interest in this case is an insurer's duty to protect its insured, and it is patently clear from the admitted and undisputed facts that Westchester failed to do so. As a result, injunctive relief is necessary and appropriate.

## 2. *Courvoisier*'s Public Policy Concerns Support USM's Request

In *Courvoisier*, the New Jersey Supreme Court declined, on the specific facts before it, to consider an insurer's bad faith in a good cause analysis under New Jersey Court Rule 2:9-6, relating to exceptions to the requirement for a full supersedeas bond.[7] The Court held that an insurer could obtain a partial stay of judgment up to its policy limits by posting a bond in that amount, rather than for the full judgment. *Id.* at 163. But the Court also recognized, when an insured alleges its insurer's bad faith was the cause of the excessive judgment, it is

---

[7]     Westchester misconstrues the meaning of *Courvoisier* as it relates to this case.

"unrealistic" to expect that an insured under such circumstances could be made whole after a full-fledged *Rova Farms* hearing. *Id.* at 166.

The Court deemed the insured's argument – that it should not be exposed to execution of excess judgment caused by its insurer's bad faith failure to settle without the protection of a full bond – to be "legally" and "intuitively persuasive." *Id.* at 165. For that reason, the Court contemplated a procedure, akin to a preliminary injunction proceeding, that would protect an insured against execution of an excess judgment pending appeal, when the judgment resulted from the insurer's bad faith conduct. *Id.* at 165-66. Such a procedure would result in "a conditional bond of the excess judgment, not collectible by the judgment creditor until the *Rova Farms* issue was resolved." *Id.* at 165.

Because in *Courvoisier* execution of the judgment had been forestalled by the insurer's partial bond and a non-dissipation-of-assets order against a possibly judgment-proof insured, the Court did not need to consider the bad faith issue in deciding the case. *Id.* at 160, 166-67. The Court noted that a judgment-proof debtor would not be concerned with "the spectre of pre-appeal execution" and that a debtor with assets could likely "bond the excess and charge back the cost of the bond to the insurer in a successful *Rova Farms* proceeding." *Id.* at 165.

The Court's concerns in *Courvoisier* for protecting an insured from the consequences of its insurer's bad faith are acutely present in this case. USM (1) is

13

not judgment proof; and (2) does not have assets available to fund the appeal bond, and is, therefore, not protected from execution of the Tran judgment.

## II.  Federal Rule 65(c)'s Bond Requirement Is Not Absolute

The Third Circuit has recognized circumstances where exceptions to the full application of the Federal Rule of Civil Procedure 65(c) are warranted. "[T]he court should consider the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant." *Temple University v. White*, 941 F.2d 201, 219 (3d Cir. 1991). In that case, which presented facts analogous to those here, the Court held "[t]he equities of potential hardships to the parties . . . weighed in favor of waiving the bond requirement" for a hospital "on the brink of financial ruin." *Id.* at 220-21; *see also Canterbury Career Schools*, 833 F. Supp. at 1106 (finding it appropriate to dispense with bond requirement based on potential "destruction of [the] on-going business" of plaintiff seeking the preliminary injunction).

The case for an exception to Rule 65(c) here is unmistakable because the injunctive relief USM seeks is protection from having to post an appeal bond that it cannot afford. The Court should balk at the absurdity of requiring USM to post a bond in order to secure an injunction relieving it of the need to post a bond.

## III.  The ADR Provision Does Not Expressly Bar This Action

14

Because the policy's ADR provision does not bar this proceeding because it does not expressly prohibit a party from seeking injunctive or other urgent relief from a court, this action should not be dismissed. *See Pyramid Elec. Co. v. Staklinski*, 61 N.J. Super. 278 (App. Div. 1960), *cert. denied*, 33 N.J. 117 (1960); *Sonotone Corp. v. Hayes*, 4 N.J. Super. 326, 330 (App. Div. 1949) (same).

Even if this Court finds the ADR provision requires the parties to first complete mediation, a stay of proceedings pending completion of mediation, not dismissal, is proper. Under the Federal Arbitration Act, Section 3, a "court shall stay the court action pending arbitration once it is satisfied that the issue is arbitrable under [an arbitration] agreement". *Elli v. Genmab*, 2006 U.S. Dist. LEXIS 74615, *21 (D.N.J. Oct. 13, 2006). Similarly, courts routinely stay litigation proceedings pending the outcome of mediation. *In Re Pet Food Prods. Liab. Litig.*, 629 F. 3d 333, 337 (3d Cir. 2010); *Meadows v Hudson County Bd. of Elections*, 2006 U.S. Dist. LEXIS 64050 (D.N.J. Aug. 24, 2006).

## CONCLUSION

For the foregoing reasons, the Court should issue a preliminary injunction ordering Westchester to pay the entire premium, and provide full collateral, for an appeal bond in the Tran Action. Alternatively, the Court should retain jurisdiction of this matter so that USM's prayer for injunctive relief can be decided prior to execution of the judgment in the Tran Action.

15

**McCARTER & ENGLISH, LLP**
Attorneys for Plaintiff,
     United States Mineral Products
     Company, d/b/a Isolatek
     International


By: */s/ Steven H. Weisman*
     Steven H. Weisman
     Member of the Firm

Dated:  October 21, 2011

16